45 A.3d 948

**Abraham KAMARA**

v.

**STATE of Maryland.**

**No. 650, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

June 7, 2012.

608

John Severt, Rockville, MD, for appellant.

Jessica V. Carter (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: WOODWARD, GRAEFF and KEHOE, JJ.

GRAEFF, J.

Abraham Kamara, appellant, was convicted in the Circuit Court for Montgomery County, pursuant to an agreed statement of facts, of possession of marijuana with the intent to distribute. The court imposed a sentence of three years, all but nine months suspended, with five years unsupervised probation.[1]

---

1. The court ordered that the sentence would not begin until the resolution of this appeal.

On appeal, appellant raises two questions for our review, which we have rephrased as follows:

1. Where the police illegally enter a home and secure the premises while they obtain a search warrant, is evidence subsequently seized pursuant to a lawful search warrant admissible under the independent source doctrine or the inevitable discovery doctrine?

2. Was the evidence sufficient to support appellant's conviction of possession of marijuana with the intent to distribute?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Suppression Hearing

On March 17, 2011, the court held a hearing on appellant's motion to suppress evidence. Counsel for the State introduced into evidence, as State Exhibits 1 and 2, a search warrant and the search inventory identifying the evidence the police seized from appellant's home pursuant to the warrant.

Detective George Witherington prepared the application and affidavit for the search warrant on November 19, 2010. The application detailed Detective Witherington's experience with controlled dangerous substances and then set forth the following:

3. On November 19th, 2010, your affiant was in the vicinity of Flower Avenue and Piney Branch Road, Silver Spring, Montgomery County, Maryland, conducting undercover narcotics operations, due to complaints of drug activity in the area. Your affiant met with an individual, later identified as Ryan Lackonsingh,[2] and engaged him in conversation. Your affiant asked to purchase marijuana and Lackonsingh

---

2. There is a discrepancy concerning the spelling of Mr. Lackonsingh's last name. For the purpose of consistency, we will use this spelling.

advised that he knew where to obtain marijuana and that he would obtain marijuana for your affiant. Lackonsingh then entered the writer's undercover vehicle and directed him to the area of Chickasaw Drive and Osage Street, Silver Spring, Montgomery County, Maryland and instructed your affiant to park on the side of the street. Lackonsingh advised that he would go purchase the marijuana at a nearby house and would be right back. Your affiant then provided Lackonsingh with $120.00 in pre recorded drug enforcement funds to purchase marijuana and Lackonsingh exited the vehicle. Detective Oaks, of the Montgomery County Police, Special Investigations Division, Tactical Narcotics Unit, then observed Lackonsingh walk to 1015 Osage Street, Silver Spring, Montgomery County, Maryland. This address will hereafter be referred to as "the residence." Oaks observed Lackonsingh knock on the front door, observed the front door open and observed Lackonsingh enter. After approximately 2 minutes, Oaks observed the front door of the residence open and observed Lackonsingh walking away from the residence, back in the direction of your affiant. Lackonsingh then arrived at and reentered the writer's vehicle. Lackonsingh the[n] handed your affiant a baggie containing green, leafy, vegetable matter, which your affiant recognized through training and experience to be marijuana, a controlled dangerous substance of schedule I. At this time other members of the Tactical Narcotics Unit converged on the area and placed Lackonsingh under arrest. Detective Chmiel, of the Montgomery County Police, Special Investigations Division, Tactical Narcotics Unit, searched Lackonsingh incident to his arrest and located two baggies containing green, leafy vegetable matter in Lackonsingh's right, front coin pocket. Chmiel recognized through training and experience that this green, leafy matter was marijuana, a controlled dangerous substance of schedule I. Additionally, Chmiel located $20.00 U.S. currency in Lackonsingh's left, front pants pocket. Detective Sergeant Carafano of the Montgomery County Police, Special Investigations Division, Tactical Narcotics Unit, confirmed that this

$20.00 was a portion of the same $120.00 that your affiant had provided Lackonsingh to purchase marijuana.

4. Upon arrest of Lackonsingh, Oaks responded to the residence to conduct a "knock and talk" investigation with the occupants. Upon approaching the residence, Oaks encountered t[w]o unidentified males who exited the residence and met Oaks in front of the residence. Oaks explained that he was at the residence to conduct an investigation and both individuals immediately became argumentative and began asking Oaks for a warrant. Carafano responded to the scene at this time and explained to the two males and an additional female inside the residence that the residence was being seized, pending further investigation. Carafano explained that your affiant would be applying for a search and seizure warrant. Oaks conducted a protective sweep of the residence in order to verify that no additional individuals were located within the residence and during this sweep, Oaks detected a strong odor of marijuana within the residence. Oaks observed approximately 1/4 pound of suspected marijuana laying in plain view on a bed within the residence, and a jar containing suspected marijuana and a digital scale, also in plain view, on a dresser within the residence. Once Oaks was confident that no additional individuals were in the residence, the house was secured pending a search warrant.

The search warrant inventory, which was introduced as State's Exhibit 2, lists the following evidence seized during the execution of the warrant:

1. Marijuana and baggies found on bed in upstairs bedroom.

2. Mail with name Abraham Kamara found on top of dresser in upstairs bedroom.

3. Marijuana scale found on top of dresser in upstairs bedroom.

4. Small bag of marijuana in blue jeans found in blue bin in downstairs bedroom.

At the hearing on the motion to suppress, Detectives Donnie Oaks and Michael Paul, members of the Montgomery County Police Department, testified regarding the events that occurred on November 19, 2010. Detective Oaks testified that Detective Witherington was working undercover, wired for audio, and he had arranged to purchase marijuana from Mr. Lackonsingh in Silver Spring. Mr. Lackonsingh entered Detective Witherington's unmarked vehicle and directed Detective Witherington to drive toward Osage Street. Detective Witherington gave Mr. Lackonsingh "pre-marked drug enforcement money," requiring Mr. Lackonsingh to leave his jacket in the car for collateral.[3] Mr. Lackonsingh left. the vehicle and walked up Osage Street. He knocked on the door at 1015 Osage Street, and an unidentified person opened the door. Mr. Lackonsingh then entered the residence. Approximately five minutes later, Mr. Lackonsingh left the house and walked back to Detective Witherington's car. After Mr. Lackonsingh entered the car and gave the detective marijuana, he was arrested.

Detective Oaks testified that, several minutes after Mr. Lackonsingh exited appellant's house, he observed another man approach the residence, whereupon a male, whom Detective Oaks identified as appellant, exited. Detective Oaks observed appellant participate in a "hand to hand drug transaction" at the bottom of the front steps.

After approximately 15 minutes, Detective Oaks decided to approach the house in order to conduct a "knock and talk." He explained: "I believed I could talk to him, and, and ask him, you know, what, what's going on in the residence. And I believed I could talk him in, you know, talk him into turning over any more marijuana he had or, and ask him who was living in the residence."

Detective Oaks and two other detectives, who were all wearing police bulletproof vests, armbands, and badges, ap-

---

**3.** Detective Oaks listened to the wire transmissions on his scanner and followed Detective Witherington's car. Mr. Lackonsingh was not searched before he left the vehicle.

proached the front door. Appellant opened the door while the detectives were walking up the front steps. He stood in the threshold of the door, with both the storm door and the "main wooden door" open, and Detective Oaks observed a "large fold of money in [an] open pocket in [appellant's] sweater." A few seconds later, appellant's brother, Kenneth Kamara, and a female came to the door. Detective Oaks took identification from each of the three individuals. He described appellant as "cooperative," but his brother was "agitated," "confrontational," and "loud." The female had a young child with her who was loud and crying.

Detective Oaks gave the identification to Detective Spellman to run a "wanted check," which indicated that that both appellant and Kenneth Kamara "had cautions for being drug dealers, users and . . . there was a caution for Kenneth being possibly armed." He refused Kenneth Kamara's request to return his identification, stating that he was waiting for Sergeant Carafano.

When Sergeant Carafano arrived, he advised that he was going to get a search warrant for the residence. He stated that the police were going to detain appellant and his brother while they sought a search warrant. He handcuffed the two men, and the police then conducted a pat down of appellant and his brother for weapons and had them sit on a couch "approximately four feet away from the front door." [4]

Detective Oaks and another officer performed a protective sweep of the residence to make sure no one else was present. He explained that a sweep of a home involved "walking through all the rooms, making sure no one is hiding in the closets, under beds. You know, you have your guns out, make sure, just for your safety, and you just check the house for individuals." He did not open drawers or move anything during the sweep because he was "looking for persons."

---

4. The woman and the child also sat on the couch. Detective Oaks testified, however, that they did not put handcuffs on the female because "[s]he was dealing with the kid. The kid was a little bit out of control."

During the sweep, he saw marijuana in a bedroom on the first floor in plain view. On the bed, there was a shopping bag containing marijuana, and on the dresser in front of the bed, there was a scale and a jar containing marijuana.[5] After the sweep, Detective Oaks called Detective Witherington, who was drafting the application for the search warrant.[6]

The officers did not question appellant, but appellant told his brother, who was very confrontational, to calm down. At some point, appellant said: "[W]hatever, this, it's all me, let him go." Appellant did not want his brother to be arrested.

While the officers were waiting for the warrant, appellant's mother came home. She was crying and very upset, asking "why, why, why."

Detective Oaks testified that the officers initially entered the home at approximately 5:32 p.m., and the search warrant was signed at 9:40 p.m. He explained the four hour delay as follows: "I know there [were] problems with getting hold of ... our Lieutenant, Marcus Jones, to approve the search warrant," as well as "problems with getting hold of the ... judge who signed the search warrant." The search warrant was approved by Sergeant Carafano at 7:03 p.m. and by Lieutenant Jones at 7:40 p.m., and it was signed by a judge at 9:40 p.m.

Detective Paul testified consistently with Detective Oaks. He stated that he did not hear the officers question appellant, nor did the officers yell at, threaten, place their hands on, or make promises to appellant or his brother. Detective Paul saw a wad of money fall out of appellant's sweater pocket "at least two or three times." He instructed Detective Williams to count the money and put it on the table in front of appellant. Detective Paul testified that appellant stated:

---

**5.** The shopping bag was a plastic grocery bag, and Detective Oaks could see the marijuana in plain view. He did not touch the bag.

**6.** Detective Oaks did not specify what he told Detective Witherington. The warrant application, however, contained information gained during the protective sweep.

"[W]hy you holding my brother? You can release him. Anything that's in this house is mine. The marijuana is mine. That, that room is mine. Anything that you would find in here is going to be mine." Appellant's brother told appellant to "shut up. They're going to use this stuff against you. Shut up." The police told appellant to remain calm. Appellant continued to say, without any questioning, that the marijuana was his.

When the warrant search was conducted, Detective Paul photographed the seized items, including marijuana and a digital scale found in the bedroom. One of the photographs showed that a door in the basement had been forced open. Detective Paul testified that it was standard operating procedure to force open a locked door during a protective sweep. The parties stipulated that appellant's father, Kenneth Kamara, Sr., would have testified that the door was not damaged when he left the home that morning. Detective Paul found a small amount of marijuana in a pocket of a pair of jeans in the basement.

The parties also stipulated that Sergeant Carafano would have testified that the money that was counted and placed on the table came from appellant's sweater. The money, which totaled $1,360 and included $80 of pre-marked drug enforcement money, was not taken off the table until after execution of the search warrant. Sergeant Carafano also would have testified that marijuana and baggies were found on the bed.

At the conclusion of the evidence, the State "conceded that the entry into the defendant's home and his arrest at that time ... violated his Fourth Amendment rights," stating that the police "created the exigency" by performing a knock and talk. The State asserted, however, that police officers may impound a house pending application for a search warrant for a reasonable amount of time. It argued that most of the evidence seized was admissible pursuant to the doctrine of inevitable discovery.

Defense counsel argued that the money was not seized pursuant to the search warrant, but rather, it was seized at the time of the unlawful arrest. He argued that the state-

ments were involuntary because he had been "in the custody of the police for some four or five hours. His house has been broken into, doors inferentially have been kicked into. His sister has been asked to leave her own house." He argued that, if paragraph four of the search warrant application, addressing contraband found inside the residence, was eliminated, then the application lacked probable cause. Counsel asserted that Mr. Lackonsingh "provided no information about whether there [were] any additional drugs still in the house," and the purchase was not a controlled buy because the police did not search Mr. Lackonsingh before he entered the house.

The circuit court was troubled by the officers' decision to "go in the house and make their own protective sweep," noting that there was probable cause for a search warrant before the officers entered the house. The court stated:

> [T]hey meet [Mr. Lackonsingh] on the sidewalk.... He then gets into the car and he's transported to the house. He tells them how to get there. Then he takes the money, the marked money, and he goes inside. He's not seen for a period of time. He comes back out and lo and behold, he's got marijuana just like he said he was going to have. Okay? And when they search him after he's lawfully arrested, in my opinion, they find marked monies. The rest of the money is gone.
>
> There's certainly probable cause to believe he used part of the marked money to buy the marijuana that he had. There's more than sufficient evidence.

The court stated that there was "plenty of probable cause for his arrest. And the information for the probable cause for the search warrant is there if you excise it, based on what the police had...."

The court found that the entry into the home and the protective sweep were unlawful, and it suppressed appellant's statements [7] and his cell phone as fruits of an unlawful arrest. It further suppressed the money:

---

7. The court ruled that appellant's statements were "suppressed insofar as the State cannot use them in their case in chief," because they were

The money that could have been seized from his person had the arrest been lawful, it was clearly the product of that unlawful arrest. It kept falling out of his pockets until the police finally indicated that, what it was.

Now, the police are not precluded from testifying that there was a large wad of cash in his pocket when he came to the door. But in connection with their testimony· that once they seized it, it turned out to be money that was possessed by the undercover informant, it seems to me that, that would be [the] product as well of the unlawful seizure of the cash.

With respect to the drugs that ultimately were seized pursuant to the warrant, however, the court viewed *Williams v. State*, 372 Md. 386, 813 A.2d 231 (2002), discussed *infra*, as dispositive of the issue. It stated:

I think that in light of the *Williams* case, I have to deny your extremely well based, well articulated, well argued, and well thought out motion.

So to take stock on where we are, the Court is denying the motion to suppress as to the items that were seized pursuant to the warrant, because I find that there was sufficient probable cause once I excised the, what was unlawfully seen and placed in the warrant.

And I find that based on the *Williams v. State* case at 372 Md. 386 [813 A.2d 231], specifically looking at page 414 and the rest of the opinion as well, that it would seem as though, on facts strikingly similar to this, the Court of Appeals would have ruled based on their reasoning, that there was an independent source because the police did have probable cause to get a search warrant; and that when [the State's Attorney] did what they did not do in *Williams v. State*— what the State did not do in *Williams v. State*, she did put in the return. It's clear that the actual evidence was seized. That is, taken into the custody of the police. It was seen,

"the direct product of his unlawful arrest and detention," but it ruled that the statements were voluntary and therefore could be used for impeachment purposes.

everything but the marijuana and the jeans was seen by the police earlier, but not seized by the police.

Therefore, the Court is going to deny the motion to suppress the actual evidence that was seized pursuant to the warrant, and which is identified as Items Nos. 1, 2, 3, and 4.

## II.

### Trial

On April 6, 2011, the case proceeded on an agreed statement of facts as to Count 3, possession with intent to distribute marijuana. The agreed statement of facts provided:

[O]n November 19th of 2010, the Montgomery County Police Department applied for and received a search warrant to search the residence of 1015 Osage Street, Silver Spring, Montgomery County, Maryland. That is a one story, single family home.

When they executed that warrant on that same day, they discovered in a front bedroom that, some bag, one bag on a bed that had multiple baggies of marijuana inside it. That particular item tested positive for 67.44 grams of marijuana. Also discovered within that bedroom, was a jar on a desk that also contained additional marijuana, baggies with marijuana in it. I think the total weight of the other marijuana was approximately 12.23 grams of marijuana.

Also discovered on the bed right next to the bag that contained the numerous bags of marijuana, was an empty, or a box of baggies that the testimony would have been by an expert, that those were baggies used as well to distribute marijuana.

There was a digital scale, which is consistent with those that are commonly used to measure out marijuana for sale.

Additionally, the testimony would have been that, that bedroom contained male clothing and also a number of items of mail were seized from that bedroom in the defendant's name. There was no other indication that, that

bedroom was occupied by anybody other than the defendant.

An expert would have been called that would have testified that given the volume of the marijuana, the packaging of the marijuana, the additional baggies as well as the weight, that this, the amount seized [8] and other indicia, indicated a possession with intent to distribute [marijuana].

Defense counsel then made a motion for judgment of acquittal, arguing that there was "no proof of any possessory interest in the room by my client." The court denied the motion and found appellant guilty. As indicated, appellant was sentenced to three years, all but nine months suspended.

## DISCUSSION

## I.

### Motion to Suppress Evidence

Appellant first contends that "the items seized pursuant to the search warrant must be suppressed as fruits of the illegal entry into and seizure of the Appellant's home by the police." In particular, he asserts that the court should have suppressed the following: (1) the evidence "discovered without the benefit of the search warrant (money and cell phone found on the Appellant and statements of the Appellant)"; (2) the evidence "discovered solely as a result of the search warrant (marijuana found in jeans pocket and mail with Appellant's name on it)"; and (3) "items found during the illegal protective sweep and by means of the search warrant (marijuana, baggies and scale found in bedroom)."

As the State notes, with respect to the first category of evidence, the State conceded during the hearing on the motion to suppress that the police entry into appellant's house and appellant's arrest violated the Fourth Amendment, and the circuit court granted appellant's motion to suppress the money and the cell phone found on appellant's person, as well as the statements appellant made to the police while they waited for

---

8. Altogether, approximately 80 grams of marijuana were seized.

the return of the search warrant. This evidence was not included in the agreed statement of facts.

With respect to the remainder of the evidence seized, which was seized during the execution of a search warrant, the State contends that the court properly denied the motion to suppress. It makes three arguments in support of this contention. First, the State asserts that "the police were authorized to seize and impound the house while they obtained a search warrant to search the house." Second, it argues that "the redacted search warrant was supported by probable cause and thus provided an independent source for searching [appellant's] house." Third, the State contends that "the trial court properly denied the motion to suppress because the items on the search warrant inventory 'inevitably would have been discovered.'"

This Court recently explained the standard of review of a denial of a motion to suppress evidence:

> In reviewing a circuit court's denial of a motion to suppress evidence, "we view the evidence adduced at the suppression hearing, and the inferences fairly deducible therefrom, in the light most favorable to the party that prevailed on the motion." We accept "[t]he factual findings of the suppression court and its conclusions regarding the credibility of testimony . . . unless clearly erroneous." With respect to the ultimate issue of constitutionality, however, we "make our own independent constitutional appraisal 'by reviewing the law and applying it to the facts of the present case.'"

*Murphy v. State,* 192 Md.App. 504, 511, 995 A.2d 783 (2010) (citations omitted).

The Fourth Amendment to the United States Constitution protects against "unreasonable searches and seizures." U.S. CONST. amend. IV. Here, the State agreed below, and on appeal, that the initial warrantless entry into the house, without consent or exigent circumstances, was unreasonable. *See Jones v. State,* 425 Md. 1, 28–29, 38 A.3d 333 (2012) ("[E]xcept when pursuant to valid consent or exigent circumstances . . . 'the entry into a home to conduct a search or

make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant.'") (quoting *Steagald v. United States*, 451 U.S. 204, 211, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981)).

■ Generally, when the police "obtain evidence in violation of the Fourth Amendment, the '[i]llegally obtained evidence is excluded under the exclusionary rule.'" *Cox v. State*, 194 Md.App. 629, 653, 5 A.3d 730 (2010) (quoting *Myers v. State*, 395 Md. 261, 282, 909 A.2d 1048 (2006)), *aff'd*, 421 Md. 630, 28 A.3d 687 (2011). This "'judicially imposed sanction' ... serves to 'deter lawless and unwarranted searches and seizures by law enforcement officers.'" *Id.*

■ There are three circumstances, however, in which evidence obtained after initial unlawful conduct can be purged of taint:

"First, evidence obtained after initial unlawful governmental activity will be purged of its taint if it was inevitable that the police would have discovered the evidence. *See Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, 387 (1984). Second, the taint will be purged upon a showing that the evidence was derived from an independent source. *See United States v. Wade*, 388 U.S. 218, 239–242, 87 S.Ct. 1926, 1938–1940, 18 L.Ed.2d 1149, 1164–1166 (1967). The third exception ... will allow the use of evidence where it can be shown that the so-called poison of the unlawful governmental conduct is so attenuated from the evidence as to purge any taint resulting from said conduct. *See Wong Sun* [*v. United States*], 371 U.S. [471,] 488, 83 S.Ct. [407,] at 417, 9 L.Ed.2d at 455 [1963]."

*Cox v. State*, 421 Md. 630, 652, 28 A.3d 687 (2011) (quoting *Miles v. State*, 365 Md. 488, 520–21, 781 A.2d 787 (2001)). These exceptions to the exclusionary rule "aim to balance the interests of society in deterring unlawful police conduct with the interest of ensuring juries receive all probative evidence of a crime." *Williams v. State*, 372 Md. 386, 409–10, 813 A.2d 231 (2002). The State argues that the first two circumstances, independent source and inevitable discovery, are applicable here to purge the taint of the illegal entry in this case.

The doctrines of inevitable discovery and independent source are closely related, but "they are analytically distinct." *Williams,* 372 Md. at 410, 813 A.2d 231. The Court of Appeals has explained:

"The inevitable discovery doctrine applies where evidence is not actually discovered by lawful means, but inevitably would have been. Its focus is on what would have happened if the illegal search had not aborted the lawful method of discovery. The independent source doctrine, however, applies when the evidence actually has been discovered by lawful means. Its focus is on what actually happened—was the discovery tainted by the illegal search?"

*Id.* (quoting *State v. Winkler,* 552 N.W.2d 347, 354 n. 4 (N.D.1996)). The Court continued:

The two doctrines differ in that "under the independent source doctrine, evidence that was *in fact* discovered lawfully, and not as a direct or indirect result of illegal activity, is admissible." *United States v. Herrold,* 962 F.2d 1131, 1140 (3d Cir.1992). Under the inevitable discovery doctrine, evidence is admissible that *inevitably would have been* discovered through lawful means even though the means that led to its discovery were unlawful. *Id.*

*Id.* at 410–11, 813 A.2d 231.

Here, the State asserts that the contraband was seized by lawful means, *i.e.,* the search pursuant to the warrant. Thus, we are addressing "what actually happened," not what "inevitably would have been discovered." Our analysis, therefore, is pursuant to the independent source doctrine.[9]

The United States Supreme Court has made clear that, even if there is initial illegal conduct, evidence seized pursuant

---

9. In *Williams v. State,* 372 Md. 386, 414–15, 813 A.2d 231 (2002), the Court of Appeals held that the independent source doctrine did not apply because the State did not introduce the search warrant return providing the inventory of the property seized, and therefore, there was "no information identifying evidence obtained through lawful means." There is no such problem here.

to a subsequent warrant may be admissible pursuant to the independent source doctrine. *Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *Segura v. United States,* 468 U.S. 796, 814, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). *Accord Williams,* 372 Md. at 412–14, 813 A.2d 231. In *Segura,* the police arrested the defendant in the lobby of his apartment building for selling drugs. 468 U.S. at 800, 104 S.Ct. 3380. The police then went to the defendant's apartment, entered without permission, conducted "a limited security check of the apartment," and impounded the apartment for 19 hours while the officers waited to obtain a search warrant. *Id.* at 800–01, 104 S.Ct. 3380. The issue presented to the Supreme Court was "whether drugs and the other items not observed during the initial entry and first discovered by the agents the day after the entry, under an admittedly valid search warrant, should have been suppressed." *Id.* at 804, 104 S.Ct. 3380.

The Court held that, even if the initial entry and occupation of the property were illegal, the challenged evidence need not be suppressed because it was discovered the day following the entry, during the search conducted pursuant to a valid warrant, and "[t]he valid warrant search was a 'means sufficiently distinguishable' to purge the evidence of any 'taint' arising from the entry." *Id.* at 813–14, 104 S.Ct. 3380 (quoting *Wong Sun,* 371 U.S. at 488, 83 S.Ct. 407). The Court noted that "none of the information on which the warrant was secured was derived from, or related in any way to, the initial entry" into the apartment. *Id.* at 814, 104 S.Ct. 3380. Thus, the information possessed by the police before they entered the apartment constituted an independent source for the discovery and seizure of the evidence challenged. *Id.*

This case is distinguishable from *Segura* in two respects. First, in this case, unlike in *Segura,* we need to address whether drugs discovered during the initial protective sweep, prior to the execution of the warrant, were admissible.[10]

---

**10.** In *Segura v. United States,* 468 U.S. 796, 803 n. 4, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), evidence observed in plain view during the initial

Second, in this case, unlike in *Segura*, information obtained during the sweep was included in the warrant application. Neither of these distinguishing facts, however, precludes a finding that the evidence is admissible pursuant to the independent source doctrine.

With respect to the first fact, the Supreme Court made clear, subsequent to *Segura*, that the independent source doctrine applies to evidence initially discovered illegally, but later obtained by an independent source untainted by the initial illegality. *Murray*, 487 U.S. at 542, 108 S.Ct. 2529. In that case, the police forced entry into an unoccupied warehouse they believed to contain marijuana and "observed in plain view numerous burlap-wrapped bales that were later found to contain marijuana." 487 U.S. at 535, 108 S.Ct. 2529. They left without disturbing the bales, but they kept the warehouse under surveillance. *Id.* They did not reenter the warehouse until they obtained a search warrant approximately eight hours later.[11] The police then reentered the warehouse and seized 270 bales of marijuana. *Id.* at 535–36, 108 S.Ct. 2529.

The Supreme Court rejected Murray's claim that the independent source doctrine applies only to evidence obtained for the first time during an independent lawful search. *Id.* at 537., 108 S.Ct. 2529 The Court adopted the Government's argument that the independent source doctrine applies "to evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *Id.* The Supreme Court explained that, if police discover items X and Y during

entry and protective sweep was suppressed, and the United States did not contest this ruling. The only issue before the Court was the admissibility of items not observed during the initial entry, but first discovered the next day pursuant to a valid search warrant. *Id.* at 804, 104 S.Ct. 3380.

11. In applying for the warrant, the police did not mention the prior entry or rely on any observations made during that entry. *Murray v. United States*, 487 U.S. 533, 536, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

an illegal search, but later, during an independent legal search, discover item Z and rediscover items X and Y, items X and Y, as well as item Z, are admissible. *Id.* at 538, 108 S.Ct. 2529. *Accord United States v. May,* 214 F.3d 900, 906 (7th Cir.) (money improperly seized pursuant to state search warrant, but properly "rediscovered" in legal federal search warrant, need not be suppressed pursuant to the independent source doctrine), *cert. denied,* 531 U.S. 891, 121 S.Ct. 217, 148 L.Ed.2d 153 (2000); *United States v. Herrold,* 962 F.2d 1131, 1143 (3d Cir.) (gun seized during unlawful entry, treated as being seized pursuant to the subsequent warranted search, was admissible pursuant to independent source doctrine), *cert. denied,* 506 U.S. 958, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992). Thus, pursuant to *Murray,* it is clear that the police observation of the marijuana and the paraphernalia during the protective sweep does not prevent application of the independent source doctrine.

The Court in *Murray* explained that the independent source doctrine rests

upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied. So long as a later, lawful seizure is genuinely independent of an earlier, tainted one (which may well be difficult to establish where the seized goods are kept in the police's possession) there is no reason why the independent source doctrine should not apply.

*Murray,* 487 U.S. at 542, 108 S.Ct. 2529. The Court stated that the "ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue." *Id.*

Thus, the issue here is whether the later search pursuant to the warrant was genuinely independent of the earlier observation of the marijuana in the house. The Court in *Murray* gave guidance on how to assess this issue. It noted two situations in which the evidence would not be deemed to be obtained by independent lawful means: (1) where the officer's

"decision to seek the warrant was prompted by what they had seen during the initial entry"; and (2) where "information obtained during that entry was presented to the [judge] and affected his decision to issue the warrant." *Id.*

In the present case, neither of these situations are present. The evidence here established that the police planned to get a warrant prior to the protective sweep or the discovery of any contraband. Detective Oaks testified that, when Sergeant Carafano arrived at the house, he announced that the police were going to detain appellant while they sought a search warrant. Appellant was then handcuffed and detained, and two officers conducted the protective sweep. The uncontradicted evidence shows that the decision to seek the search warrant was not prompted by what the officers saw during the initial protective sweep.[12]

We do note that, in this case, unlike in *Segura* and *Murray,* the warrant did contain a paragraph referencing the drugs found during the initial entry and search of appellant. That, however, is not determinative. The Court in *Murray* noted that the inquiry was whether the information obtained during the initial sweep was presented to the judge **and** *"affected [the] decision to issue the warrant." Murray,* 487 U.S. at 542, 108 S.Ct. 2529. In making this assessment, the Court of Appeals has explained that a court need not consider the *actual* effect of the evidence on the individual judge. Rather, the following objective test is employed: "[W]hether, after the constitutionally tainted information is excised from the warrant, the remaining information is sufficient to support a finding of probable cause." *Williams,* 372 Md. at 419, 813 A.2d 231.

■ If the remaining information in the warrant, apart from the tainted information, establishes probable cause, the warrant is lawful. *Id.* at 420, 813 A.2d 231. In this circum-

---

12. The circuit court, during the State's argument, agreed with the prosecutor that, at the point that Sergeant Carafano decided to obtain a search warrant, no illegal conduct had occurred.

stance, the independent source doctrine applies, and evidence seized pursuant to the warrant need not be suppressed. *See, e.g., United States v. Etchin,* 614 F.3d 726, 737–38 (7th Cir. 2010) (marijuana observed during illegal entry admissible because warrant affidavit contained sufficient probable cause without the illegally obtained evidence), *cert. denied,* —— U.S. ——, 131 S.Ct. 953, 178 L.Ed.2d 786 (2011); *United States v. Price,* 558 F.3d 270, 283 (3d Cir.) (evidence found in residence admissible because search warrant affidavit contained sufficient probable cause after information obtained from illegal search of basement redacted), *cert. denied,* —— U.S. ——, 130 S.Ct. 375, 175 L.Ed.2d 157 (2009); *United States v. Jenkins,* 396 F.3d 751, 756, 760 (6th Cir.) (evidence found in hotel room admissible, despite initial warrantless search, where information gained from the illegal search was redacted from the warrant affidavit and the remaining information constituted probable cause), *cert. denied,* 546 U.S. 813, 126 S.Ct. 336, 163 L.Ed.2d 48 (2005); *State v. Gulbrandson,* 184 Ariz. 46, 906 P.2d 579, 590–91 (1995) (although initial warrantless entry into apartment was unlawful, where evidence subsequently was seized pursuant to a lawful warrant, it need not be suppressed), *cert. denied,* 518 U.S. 1022, 116 S.Ct. 2558, 135 L.Ed.2d 1076 (1996); *People v. Weiss,* 20 Cal.4th 1073, 86 Cal.Rptr.2d 337, 978 P.2d 1257, 1262–63 (1999) (although initial search of home unlawful, evidence subsequently seized pursuant to a warrant was admissible where, after redacting information based on the illegal search, there was sufficient probable cause for the issuance of the warrant), *cert. denied,* 528 U.S. 1158, 120 S.Ct. 1166, 145 L.Ed.2d 1076 (2000); *People v. Pahl,* 169 P.3d 169, 177 (Colo.Ct.App.2006) (same); *State v. Watts,* 801 N.W.2d 845, 856 (Iowa 2011) (same).

■■■ Applying the above analysis to determine if the search pursuant to the warrant was an independent source of the contraband found in the bedroom, we must redact the reference to the evidence found pursuant to the protective sweep and then determine whether the remaining information in the affidavit contained adequate facts from which the warrant-issuing judge could have concluded that probable

cause existed for the issuance of the warrant. Probable cause is defined as " 'a fair probability that contraband or evidence of a crime will be found in a particular place.' " *Agurs v. State,* 415 Md. 62, 76, 998 A.2d 868 (2010) (quoting *Patterson v. State,* 401 Md. 76, 91, 930 A.2d 348 (2007)). " 'The rule of probable cause is a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction but more evidence than that which would arouse a mere suspicion.' " *Wilkes v. State,* 364 Md. 554, 584, 774 A.2d 420 (2001) (quoting *Doering v. State,* 313 Md. 384, 403, 545 A.2d 1281 (1988)). *Accord Malcolm v. State,* 314 Md. 221, 233, 550 A.2d 670 (1988) ("probable cause does not demand the certainty associated with formal trials; it is sufficient that a 'fair probability' existed"). Moreover, probable cause is based on the factual and practical considerations of everyday life on which reasonable people act. *Wilkes,* 364 Md. at 584, 774 A.2d 420. *Accord Maryland v. Pringle,* 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003).

Here, once the paragraph referring to the evidence observed during the protective sweep is excluded, the remaining information in the affidavit contains adequate facts from which a judge could have concluded that probable cause existed for the issuance of the search warrant. As indicated, *supra,* an undercover officer approached Mr. Lackonsingh and asked if he could get the officer marijuana. Mr. Lackonsingh replied that he could, entered the undercover vehicle, and directed the officer to 1015 Osage Street. The officer gave Mr. Lackonsingh $120 of marked law enforcement money for the purchase. Mr. Lackonsingh then entered the residence and returned shortly with marijuana. A search of Mr. Lackonsingh incident to his arrest revealed additional marijuana, with only $20 of marked law enforcement money remaining. Given this evidence, there was sufficient probable cause to support the warrant, even after the paragraph detailing the evidence found during the protective sweep is deleted. *See, e.g., Carrillo v. State,* 98 S.W.3d 789, 792–93 (Tex.App.2003) (probable cause existed that cocaine was present in residence where

undercover officer arranged to purchase cocaine from a subject who drove to defendant's residence, went inside, and after further activity, left the residence and delivered cocaine to the police officer).

In sum, although the initial entry into appellant's home was improper, the drugs and paraphernalia ultimately seized were seized pursuant to a valid warrant. The warrant was independent of any observations made in the subsequent protective sweep because: (1) the police made the decision to seek a search warrant prior to that time; and (2) the application for a warrant, deleting reference to the observations obtained during the protective sweep, contained sufficient probable cause to issue the warrant. Accordingly, the evidence seized was admissible pursuant to the independent source doctrine, and the trial court correctly declined to suppress the evidence seized pursuant to the search warrant.

## II.

### Sufficiency of the Evidence

Appellant next argues that there was insufficient evidence to support a finding that he was in possession of the marijuana. He argues that there was no evidence: (1) that he was in the bedroom where the marijuana was discovered on the date of the search; (2) that access to the bedroom was limited to him; or (3) that he was aware of the marijuana found in the bedroom.

The State contends that the evidence was sufficient to sustain appellant's conviction for possession of marijuana with intent to distribute. It argues that, pursuant to the agreed statement of facts, appellant agreed that "there was no indication that ... the bedroom [where the contraband was found] was occupied by anyone other than" appellant. It asserts that those agreed facts establish that appellant, "and [appellant] alone, in fact occupied that bedroom," and therefore, he was in possession of the contraband.

The test of appellate review of evidentiary sufficiency is whether, " 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *State v. Coleman*, 423 Md. 666, 672, 33 A.3d 468 (2011) (quoting *Facon v. State*, 375 Md. 435, 454, 825 A.2d 1096 (2003)). The Court's concern is not whether the verdict is in accord with what appears to be the weight of the evidence, "but rather is only with whether the verdicts were supported with sufficient evidence—that is, evidence that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offense charged beyond a reasonable doubt." *State v. Albrecht*, 336 Md. 475, 479, 649 A.2d 336 (1994). Further, "the finder of fact has the 'ability to choose among differing inferences that might possibly be made from a factual situation.... ' That is the fact-finder's role, not that of an appellate court." *Smith v. State*, 415 Md. 174, 183, 999 A.2d 986 (2010) (quoting *State v. Smith*, 374 Md. 527, 534, 823 A.2d 664 (2003)). Moreover, when evaluating the judgment of the trial court in a non-jury trial, the judgment of the trial court will not be set aside unless clearly erroneous. *Khalifa v. State*, 382 Md. 400, 418, 855 A.2d 1175 (2004).

In the present case, applying this standard of review, we hold that there was sufficient evidence to support appellant's conviction of possession of marijuana with the intent to distribute. The term possession is defined as "to exercise actual or constructive dominion or control over a thing by one or more persons." Md.Code (2010 Supp.) § 5–101(u) of the Criminal Law Article. To prove dominion and control, "the 'evidence must show directly or support a rational inference' " that the accused " 'exercised some restraining or directing influence' " over the drugs. *Jefferson v. State*, 194 Md.App. 190, 214, 4 A.3d 17 (2010) (quoting *Garrison v. State*, 272 Md. 123, 142, 321 A.2d 767 (1974)). Knowledge of the presence of drugs is required to exercise dominion and control. *State v. Suddith*, 379 Md. 425, 432, 842 A.2d 716 (2004). Such knowledge may be proven by circumstantial

evidence and by inferences drawn therefrom. *Smith,* 374 Md. at 537, 823 A.2d 664.

Pursuant to the terms of the statute, "possession may be constructive or actual, exclusive, or joint." *Belote v. State,* 199 Md.App. 46, 55, 20 A.3d 143 (2011). Factors to be considered in determining whether there was constructive possession include the following:

> [ (1) ] the defendant's proximity to the drugs, [ (2) ] whether the drugs were in plain view of and/or accessible to the defendant, [ (3) ] whether there was indicia of mutual use and enjoyment of the drugs, and [ (4) ] **whether the defendant has an ownership or possessory interest in the location where the police discovered the drugs.** None of these factors are, in and of themselves, conclusive evidence of possession.

*Smith v. State,* 415 Md. at 198, 999 A.2d 986 (citations omitted) (emphasis added).

Here, the agreed facts support a reasonable inference that appellant had a possessory interest in the bedroom where the marijuana was found. The bedroom contained male clothing, and there were several items of mail in appellant's name. Moreover, as the State points out, the agreed statement of facts also provided: "There was no other indication that, that bedroom was occupied by anybody other than the defendant." Thus, there was sufficient evidence for the court to find that the room was appellant's bedroom. *See Farnsworth,* 920 N.E.2d at 55 (sufficient evidence that area was the defendant's bedroom where "[p]resent in the room were the defendant's time card, writings to him, men's clothing, men's boots, and items consistent with the defendant's age, such as video game controllers"). *Accord Chan v. State,* 78 Md.App. 287, 317–18, 552 A.2d 1351 (1989) (letter addressed to "Sonny Chan" at premises, along with appellant's presence at time of search, supported inference that appellant had possessory interest in the premises).

Courts in other states have held that, when contraband is found in a defendant's bedroom, that evidence is sufficient to

support a conviction of constructive possession. In *Commonwealth v. Farnsworth,* 76 Mass.App.Ct. 87, 920 N.E.2d 45, 55, *review denied,* 456 Mass. 1102, 922 N.E.2d 153 (2010), the Massachusetts Appeals Court stated:

> "When contraband is found in a dwelling shared by a defendant and one or more other persons, a finder of fact may properly infer that the defendant is in possession of the contraband (not necessarily exclusive possession) from evidence that the contraband was found in proximity to personal effects of the defendant in areas of the dwelling, such as a bedroom or closet, to which other evidence indicates the defendant has a particular relationship."

(Quoting *Commonwealth v. Rarick,* 23 Mass.App.Ct. 912, 499 N.E.2d 1233, 1233 (1986)).

Similarly, in *O'Brien v. State,* 422 N.E.2d 1266, 1272 (Ind. Ct.App.1981), the Court of Appeals of Indiana explained: "Because bedrooms are usually private areas of a house ... evidence indicating sole occupancy of a bedroom supports a logical inference of control and knowledge of the room's contents by the usual occupier." *Accord State v. Crawford,* 130 Idaho 592, 944 P.2d 727, 730 (Idaho Ct.App.1997) (where evidence showed exclusive control of bedroom, there was evidence to support "an inference that Crawford knew of and exercised control over the cocaine found in the dresser in what was proven to be her bedroom"); *State v. Hudson,* 277 S.C. 200, 284 S.E.2d 773, 775 (1981) ("Where contraband materials are found on premises under the control of the accused, this fact in and of itself gives rise to an inference of knowledge and possession which may be sufficient to carry the case to the jury.").

Here, pursuant to the Agreed Statement of Facts, the trier of fact was permitted to infer that appellant was the sole occupant of his bedroom, and as such, that he had knowledge and control of the drugs found in that room. The evidence was sufficient to support appellant's conviction for possession with intent to distribute marijuana.

JUDGMENT OF THE CIRCUIT COURT FOR MONT-
GOMERY COUNTY AFFIRMED.  COSTS TO BE PAID
BY APPELLANT.